**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 1:21-cr-00548-DLF-1** |
| | : | |
| **CAREY J. WALDEN,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Carey Walden to at least two weeks incarceration, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.[1]

## I.     Introduction

The defendant, Carey Walden, a Navy and United States Marine Corps veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Walden pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, a period of at least two

---

[1] A period of probation after a term of incarceration may also be appropriate in the defendant's case. The general prohibition against sentences that combine continuous incarceration and a term of probation, see 18 U.S.C. § 3551(b), does not apply where, as here, the defendant is sentenced for a petty offense, see 18 U.S.C. § 3561(a)(3); *United States v. Posley*, 351 F. App'x 801, 809 (4th Cir. 2009).

1

weeks incarceration is appropriate in this case because (1) Walden anticipated and was prepared for violence by bringing a gas mask to Washington, D.C.; (2) he scaled a wall outside of the Capitol Building; (3) he penetrated the U.S. Capitol through a broken window; (4) he previously served in the United States Navy and Marine Corps; (5) he took photographs and videos inside and outside of the Capitol; and (6) he showed a lack of remorse for his conduct by posting to Facebook a photo of the chaos outside the Capitol Building with the caption "I had just climbed the west wall lol." This conduct merits a custodial sentence, even though Walden did not personally engage in an act of violence against an individual or destroy any property, and even though he promptly accepted responsibility after charges were brought against him.

Even if he didn't personally engage in violence or property destruction during the riot, Walden celebrated the violence of that day.  He posted a photo to Facebook of the attack on the U.S. Capitol where with the caption "I had just climbed the west wall lol."

Walden then advanced into the Capitol through a broken window next to the Senate Wing Door.  Walden can be seen in his own video approaching the broken-out window and waiting with others to climb through the window.  Walden can also be seen in a third-party video chanting with others "traitors, traitors, traitors."  Walden then exits through a broken window approximately nine minutes after making entry.  Walden never left the area of the foyer immediately inside the Senate Wing doors.  Even though Walden was only in the Capitol for a short time and his travel was limited, his behavior is still aggravating given his chanting and especially because of his military background.

The Court must also consider that Walden's conduct on January 6, like that of thousands of others, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so

many others, the riot likely would have failed to breach the Capitol building and delay the election certification vote for hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Walden's participation in a riot that actually succeeded in halting the Congressional certification combined with the Walden's preparation for violence, his celebration and endorsement of the violence on that day, his lack of remorse that day, and the potential for future violence renders a period of active incarceration both necessary and appropriate in this case.

## II.    Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Walden's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Walden traveled by bus to Washington, D.C., from his residence in Kansas City, Missouri to attend the "Stop the Steal" rally.  The bus Walden rode was one of two rented for the purpose of transporting people to the rally.  Walden was wearing blue jeans, a gray sweatshirt, a blue respirator, and a red Kansas City Chiefs beanie.  Walden was unemployed and did not pay for the bus ticket, but received it from a friend who could not attend the rally.

3

Walden was prepared for possible violence in light of the fact that he brought a blue respirator that could serve as a gas mask. *See* ECF 1-1 at ¶ 18. Walden posted to Facebook a photo of the riots "I had just climbed the west wall lol" as depicted in Figure 1 below.



**Figure 1**

The Senate Wing door area through which Walden gained entry was initially breached at 2:13 pm.  Walden climbed through the window adjacent to the Senate Wing door approximately thirty-six minutes after the initial breach.[2]

At approximately 2:49 pm, Walden made entry into the United States Capitol building by climbing through a window adjacent to the Senate Wing doors as shown on the video recovered from Walden:

 

Once inside, Walden remained in the hallway in the vicinity of the Senate Wing door.

---

[2] The statement of offense supporting the please mistakenly identifies Walden as having entered the Capitol Building at approximately 1:44 pm and then leaving at approximately 1:58.  A review of time stamped surveillance footage reveals that this is erroneous.  The error was corrected at the plea hearing in which the government noted that the time stamping on the footage was adjusted due to the difference in time zones from where the footage was captured in the District of Columbia and where it was initially viewed by agents in Kansas City, Missouri. The actual time is an hour later.



At different times he can be seen and heard on third party video chanting.  At one point, Walden

can be seen and heard chanting with others "traitors, traitors, traitors."



After remaining in the hallway by the Senate Wing door for approximately nine minutes, Walden

exited the Capitol at approximately 2:58 pm.

6



*Carey Walden's Interview*

Walden voluntarily agreed to an interview with the FBI prior to his arrest, which took place on February 3, 2021.  Walden admitted that he was present during the riot and entered the Capitol.  Using a diagram of  Capitol building, he showed the agent "where I think I was during protest."  Walden then forwarded three videos and four photographs from his phone to the agents.  Walden also acknowledged that he took a photograph of the Capitol during the riot that appeared on his Facebook page.  Walden provided the following written statement describing his conduct during the riot:

> I, Carey J. Walden, climbed a wall into the Capitol building on 6 Jan 21, at approx 1:00pm to 1:30pm. I took pictures and videos of where I entered.  I went into a broken window, which was already broken. I walked in a 15 SQ FT, area, witch [sic] there were police in a line guarding a passage way. I took pictures and video. I did <u>not</u> break anything. The police were present and I was not asked to leave. I fist bumped and "Devil horned" the swat line. I left after about 5 minutes. I walked out after I heard that someone was shot. I was wearing blue jeans gray sweatshirt, blue respirator, red chiefs beanie. Had a backpack, with all of the belongings I have. I was not armed, nor had body armor. I am not a part of any hate groups. I went with a bus of Trump supports. I am a U.S Marine (inactive) veteran. These are my recollections of that day.

Walden signed and dated the statement.

*The Charges and Plea Agreement*

On May 21, 2021, Walden was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On May 28, 2021, he self-surrendered to authorities in Kansas City, Missouri.  On August 31, 2021,  Walden was charged by an Information with a violation of 18 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. On October 26, 2021, he pleaded guilty to the Information. By plea agreement, Walden agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Walden faces a sentencing on a single count of 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Walden faces up to six months of imprisonment and a fine of up to $5,000.[3]  Walden must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

---

[3] Because Walden has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history that defies comparison to other events. It represented a grave threat to our democratic norms and was the only the second time in our history when the building was literally occupied by hostile participants.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, the Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated

sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Walden was prepared for violence when he traveled to Washington, D.C.  He brought a gas mask apparatus and wore it inside the U.S. Capitol Building.  He entered the Capitol Building through a window that had been smashed out.

As a Navy and Marine veteran, Walden was or should have been aware of the great jeopardy posed by violent entry into the Capitol by the rioters and of the violent force required to overcome the police who were guarding the Capitol in order make that entry into the Capitol. Walden incited and celebrated the violence that was required to break through the police line by repeatedly chanting in the Capitol Building "traitor – traitors."[4]

Walden entered the building not long after it was breached. While no police officers blocked his path, there were clear signs of violent entry. The window was smashed out. Walden would have heard the alarm sounding throughout the Capitol near the emergency exit that had been forced open.  Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  Walden's History and Characteristics**

---

[4] Chanting "traitors" while inside the Capitol, although speech, was aggravating because it was intended to further incite the mob.  While calling Members of Congress "traitors" may be protected in a different context, it was not here if it was intended to promote a crime.  The First Amendment, moreover, does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.  *Wisconsin v. Mitchell*, 508 U.S. 476 (1993).

As set forth in the PSR, Carey Walden's criminal history consists of two driving under the influence of alcohol offenses and a passing a bad check conviction.  His probation for the bad check charge was revoked in 2010 and he served two days in custody.  Carey Walden also served two days in jail for the 2007 DWI offense. Walden's military service is laudable. At the same time, it renders his conduct on January 6 all the more troubling.  On June 23, 1992 Walden enlisted in the United States Navy and was honorably discharged on January 30, 1999.  Walden enlisted in the United States Marine Corps on January 31, 2000, and he was discharged "General" on September 20, 2005.  Walden was a landing support specialist and attained the rank of E5.

As a former United States Navy and Marine Corps service member, Walden knew that one's disagreement with the actions of government officials does not bestow a right to enter restricted government buildings. His  decision to storm a guarded government building is deeply troubling in light of his former military service and training.  Walden's former military service makes his conduct on January 6 all the more troubling and demonstrates a very real need for specific deterrence in the form of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the

---

[5] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was intended by many of the rioters to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70; *see also United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing), *see also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Walden's words during the riot and on social media clearly demonstrate the need for specific deterrence for this defendant.  Walden celebrated the violence of the day on January 6 by chanting "traitor – traitors" inside the U.S. Capitol.  Walden also made light of the attack on the Capitol as it was occurring as evidenced by his Facebook posts "I had just climbed the west wall

13

lol."   By adding "lol" or "laugh out loud," Walden displayed callousness toward a tragic event.

As noted by Judge Jackson in sentencing Russell Peterson to thirty days of active incarceration for

a violation of 40 U.S.C. § 5104(e)(2)(G):

> The "lol" particularly stuck in my craw because, as I hope you've come to understand,
> nothing about January 6th was funny . . .  No one locked in a room, cowering under a table
> for hours, was laughing.

Transcript of hearing, *United States v. Russell Peterson*, 1:21-cr-00309-ABJ-1 (Dec. 1, 2021), pg.

19.  Moreover, Walden's prior periods of incarceration, albeit short, argue compellingly for an

active period of incarceration.  Simply put, his previous jail sentences did not make him think

twice about illegally entering the United States Capitol on January 6, 2021.  Though not every

factor listed above supports a sentence of incarceration, on balance, enough factors warrant a brief

jail term.  A sentence of probation or home confinement would be insufficient.

### The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles

in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[6] Each offender must be sentenced based on their individual circumstances, but with the

backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum

that ranges from conduct meriting a probationary sentence to crimes necessitating years of

imprisonment.  As of December 30, 2021, approximately 70 federal defendants have had their

cases adjudicated and received sentences for their criminal activity on January 6, 2021.  Thirty-

one have been sentenced to periods of incarceration. Eighteen have been sentenced to a period of

---

[6] Attached to this supplemental sentencing memorandum is a table providing additional
information about the sentences imposed on other Capitol breach defendants.  That table also
shows that the requested sentence here would not result in unwarranted sentencing disparities.

home detention, and the other defendants have been sentenced to probation with no term of incarceration.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[7]  Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (similar statement by Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Walden has pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18

---

[7] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), and whether he has prior military service—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed on Derek Jancart and Russell Peterson for reference. Defendant Jancart, like Walden, is a veteran and entered through the area of the Senate Wing door. Jancart spent more time in the Capitol, but like Walden did not do any damage to the Capitol and did not engage in assaultive conduct. Like Jancart, Walden has prior misdemeanor convictions: two driving under the influence of alcohol offenses and a passing a bad check conviction. The Court imposed a 45 day period of incarceration for Jancart. Defendant Peterson, like Walden, also entered through the Senate Wing door during the same time frame. Peterson, like Walden, has at least one prior conviction and both made light of the seriousness of the attack on the Capitol by using the term "lol" for "laugh out loud." Peterson received a thirty-day jail sentence. *See also United States v. Kevin Cordon and Sean Cordon*, Case No. 21-cr-269-TNM and *United States v. Matthew Mazzocco*, 1:21-cr-00054-TSC-1.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Carey Walden to at least two weeks incarceration, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing active incarceration, but not for a lengthy period, as a consequence of his behavior, while recognizing his early acceptance of responsibility.


Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC BAR NO. 481052

*/s/ James D. Peterson*
JAMES D. PETERSON
VA Bar 35373
James D. Peterson
Trial Attorney
Criminal Division
United States Department of Justice
1331 F Street N.W.
6th Floor
SAUSA
U.S. Attorney's Office for the District of Columbia
Washington, D.C. 20530
(202) 353-0796
James.d.peterson@usdoj.gov