UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cr. No. 21CR00548 (DLF) |
| ) | |
| CAREY WALDEN ) | |

## MEMORANDUM IN AID OF SENTENCING

Carey Walden, by his attorney, Christopher Davis, hereby submits the following memorandum in aid of sentencing in this matter. Pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a) as delineated in *Rita v. United States*, 127 S. Ct. 2456 (2007), *Kimbrough v. United States*, 128 S. Ct. 558 (2007), *Gall v. United States*, 128 Ct. 586 (2007) and *Nelson v. United States*, 555 U.S. 338 (2009), Mr. Walden respectfully requests that this Court not impose a sentence of incarceration. On the specific facts of his case, he submits that a sentence that allows him to continue his employment is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553. Sentencing is currently scheduled for January 19, 2022, at 12:00 p.m.

### FACTUAL BACKGROUND

1. On October 26, 2021, Mr. Walden pled guilty to a one count

1

information charging him with Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 USC §5104(e)(2)(G). A conviction for this offense exposes him to a maximum penalty of 6 months imprisonment, pursuant to 40 USC §5109(b); a fine of no more than $5,000. He is eligible for up to five years' probation because the offense is a misdemeanor. See, 18 USC § 3561(c)(2). Pursuant to 18 USC §§ 19 and 3583(b)(3), this offense meets the definition of a "petty offense" and a term of supervised release is not applicable. The offense is a Class B misdemeanor, as defined by 18 USC § 3559(a)(7). Pursuant to USSG§1B1.9, the sentencing guidelines do not apply to Class B misdemeanors. Mr. Walden has agreed to pay both a $10 special assessment and $500 in restitution. The criminal conduct charged in the information occurred January 6, 2021.

## ARGUMENT

2. Carey Walden should be sentenced based on his individual circumstances, with the backdrop of the January 6 riot in mind. And Mr. Walden's individual circumstances warrant serious consideration in deciding what punishment is appropriate for his role in the proverbial attack on democracy that occurred on January 6, 2021.

3. This Court is guided by the factors outlined in 18 U.S.C. §3353(a)

when deciding which party's proposed sentencing recommendation is fair and just. These factors include: "The nature and circumstances of the offense and the history and characteristics of the defendant; . . . the kinds of sentences available; . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and . . . the need to provide restitution to any victims of the offense." 18 U.S.C. 3553(a).

4. Pursuant to 18 U.S.C. § 3661, no limitation shall be placed on the information concerning the background, character, and conduct of a person being sentenced. After considering all of the factors set forth in § 3553(a), the Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, afford adequate deterrence, protects the public, and effectively provides the defendant with needed educational or vocational training and medical care. 18 U.S.C. § 3553(a)(2)).

5. With these limitations, and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 18 U.SC. § 3553 (a)(2).

*The Nature and Circumstances of the Offense*

6. Mr. Walden neither disputes that the January 6th attack on the Capitol

3

represented a grave threat to our democratic norms nor that it was only the second time in our history when the building was literally occupied by hostile participants. When approached by law enforcement, he immediately gave a full and truthful accounting of what actions he took that day. He did not assault anyone, he did not destroy any government property, and he was in the capitol for the sum total of 9 minutes, as acknowledged by the United States in its sentencing memo.

7. Walden did not plan to come to Washington, DC in advance of January 6. As he explained in his statement to the FBI and the letter he has submitted to the Court (*See* Ex. 1), a friend had a ticket to travel to see former President Trump speak on January 6. He was unable to travel and gave Mr. Walden his bus ticket. There were no members of extremist groups on the bus. There were no pre-trip social media postings promulgating conspiracy theories. Nor were there any denigrating posts concerning the state of the political system in the United States. He simply came to DC and he did not even hear the former president speak.

8. Mr. Walden, as he told the FBI, scaled the wall outside the Capitol and went into the building through a broken-out window. Once inside the building, he approached a man who had been pepper sprayed. He offered comfort and advice to the man who was obviously in distress. The crowd began to chant "traitors." Walden momentarily joined the chant. He got caught up in the moment, but almost immediately recognized things were out of hand and left. His explanation

of what happened is simple, "*I am remorseful for the things that happened that day. The smart thing to have done would have been to just stay away from all of it, and I didn't do that. I had no desire to destroy property, attack police officers or try and overthrow the government, and I did NOT do those things. I'm not "Trumper" nor am I supporter of President Biden. I am a voter, and I've voted Democrat and Republican. Mostly I identify as an American Veteran, who believes we have the greatest country on earth, mainly because I've been to countries that do not have our rights, our freedoms, and certainly not our standard of living. I'm not a member of any group that's labeled as extremist.*" See, Ex. 2.

*Carey Walden's History and Characteristics*

9.  Carey Walden has two prior DWI's, the latter falling on the heels of the former.  He left the Marines 2005 and after over a decade in the military,[1] and he had a hard time readjusting to civilian life. He quickly realized that alcohol was not the solution and he has not had a problem since then (16 years ago).  He did overdraw a $22 check at a pizza parlor 12 years ago, but comparatively speaking, his criminal history is limited.

10.  Though always employed and continually training for numerous semi-skilled positions, Mr. Walden has had more than his share of demons with which to

---

[1] Walden joined the Navy in 1992 and left the Marines in 2005.

contend.  Diagnosed with PTSD in 2004,[2] while he is fighting for his country, he heard that his first wife took up with his sister-in-law's husband.  All things considered, 2004 to 2006 were hard years for Walden.  PTSD, marital problems at home, alcohol, and difficulties adjusting to civilian life after more than a decade in the military wreaked havoc with his mental stability.

11.  Carey Walden struggled quietly, until he fell in the spotlight of the events of January 6, 2021.  He is a kind and compassionate man.  During his 9-minute stay in the Capitol he attended to an elderly obese man who is painfully trying to deal with the effects of having been pepper sprayed.  When the crowd chanted, Walden joined and then almost immediately realized that it was wrong.  He left the building.  He respectfully asks this Court to not judge him solely for a few minutes in an otherwise admirable life.  He knows good from wrong, he is honest and loyal, and he is truly remorseful for what he recognizes was a grave lapse in judgement.

---

[2] Carey Walden does not fall back on his experiences as an excuse for his conduct.  He did not even discuss this with the PSR writer.  She simply noted that he was diagnosed with PTSD in 2004.  It is noteworthy that Walden has paid his dues to this country; Nov 2003 to May 2004, various missions in Afghanistan with 2nd Battalion 8th Marine Regiment. Security duty at Bagram Air Base, combat operations out of MSS (Mobile Support Site) Asadabad, FOB Nongalom and Barikowt;  Feb 2003 to Jul 2003, with the 26th MEU (SOC) deployed aboard the USS Nashville for duty in the Iraqi theater; He left that deployment in July on emergency leave, when notified that his younger sister had been killed in a car wreck; Nov 1993 to Mar 1994 deployed with the USS Independence to the Arabian Gulf for Operation Southern Watch; July 1994 to Aug 1994 deployed with USS Independence off the coast of Korea for the Korean crisis; Aug 1995 to Nov 1995 Deployed with USS Independence to Arabian Gulf for his second Operation Southern Watch deployment;  Feb 1996 to Mar 1996 Deployed to South China Sea.  He has risked life and limb for this country.

12. Mr. Walden has a good job that he has been at for a little over a month. He needs to work, for both economic security and his own mental wellbeing. He is the sole source of support for his household. He requests that no matter what sentence is imposed, he be allowed to continue to work.

***The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Afford Adequate Deterrence***

13. The events of January 6, 2021 cannot be overstated. It was, in short, a horrific day for America. However, Carey Walden is not in need of specific deterrence. He knows and labors under the guilt of his actions every day. Each time he appears in court, the community reads about this man, who has up until that day, had been nothing short of a proud defender of this country.

14. His remorse is sincere. He has been prepared to plead guilty since he was arrested. The delay in the entry of a plea cannot be attributed to him. This Court should be aware of this fact. It factors into the need for deterrence.

15. General deterrence is a more difficult topic to address. Nonetheless, each defendant is different and despite the stain of the events of January 6, some defendants, including Mr. Walden, deserve recognition of their life history.

***The Need to Avoid Unwarranted Sentencing Disparities***

16. The need to avoid unwarranted sentencing disparities is probably the most fundamental concept underlying a court's duty to fairly sentence a criminal defendant. In Ex. 1 to the Government's sentencing memorandum, 74 sentencings

for January 6 offenses are detailed. *See*, Dkt. 24. The Washington Post charted and detailed these cases on January 6, 2022. Included in the 74 cases are 7 felonies and 67 misdemeanors. *See*, Ex. 2 at p. 3. In 49 of the 74 cases, the court has sentenced below the Government's recommendation.

17. Thirty-five defendants have been sentenced to a term of incarceration while 39 were sentenced to home detention or probation. *See*, Ex. 2 at p. 2. Included in the 35 cases that resulted in a sentence of incarceration are the 7 felonies. *See*, Ex. 1 to Dkt. 24. Narrowing the results, the 28 misdemeanor cases (35-7=28) that resulted in a sentence of incarceration comprise 41.7% of all the misdemeanor cases sentenced so far (28/67 = .41.7 = 41.7%). The end result is that the majority of misdemeanor cases do not result in a sentence of incarceration.

18. The United States correctly notes that "Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind." It then goes on to argue for incarceration by stating that "[W]hile no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the sentences imposed on Derek Jancart and Russell Peterson for reference." Mr. Walden, in turn, distinguishes these two cases as follows.

**U.S. v. Derek Jancart, 12cr148 JEB**

19. In sentencing this defendant to 45 days as opposed to the Government's

recommendation of 4 months incarceration, Judge Boasberg relied on the following facts outlined in the Government's sentencing memo (Dkt. 25).  Jancart posted videos on social media advocating revolution, both before and after January 6.  He traveled to the Capitol with another person and carried a two-way walkie, a gas mask, Kevlar lined gloves and a medical kit.  He is a veteran, having served 4 years in the Air Force.  However, he deeply penetrated the Capitol, ultimately making his way to the Speaker's conference room.  He remained in the Capitol for 40 minutes.  He posted a question on social media "does anyone know the law concerning carrying a pic ax in the District of Columbia."  During the events of that day, he carried a backpack.  The FBI executed a search warrant at his home at the time of his arrest.  That same backpack was found – with a pic ax in it.  He observed physical and verbal assaults on law enforcement, yet he stayed in the Capitol.  He also took evasive actions after January 6 by deleting various social media posts.  The United States argued that he demonstrated a total lack of remorse.  Jancart clearly demonstrated this by telling the FBI that he had a right to be in the Capitol that day.

    20.  Walden did not post denigrating comments on social media concerning the election, the political system, or politicians before or after January 6.  He believes in this country.  He remained in the Capitol for all of 9 minutes and then - on his own volution left – recognizing the error of his decision to enter.  He was

not armed.  He has expressed remorse from day one.  He remains remorseful.

**United States v. Russell Peterson, 21cr309 (ABJ)**

21. In sentencing this defendant to 30 days as opposed to the Government's recommendation of 14 days incarceration, Judge Jackson relied on the following facts outlined in the Government's sentencing memo (Dkt. 27).

22. Peterson made numerous disturbing posts on social media, before and after January 56.  He was advocating for "martial law" and "public executions to restore the balance and peace of this country."  He was well aware of the violence perpetrated against law enforcement as he deeply penetrated the Capitol.  He sat in Pelosi's chair, smoked a blunt and celebrated his accomplishments with posts on social media, exclaiming that "we took over the capital."  Upon arrest he lied to the FBI.  A search of his home found numerous weapons and ammunition, along with a backpack with a knife and ax.  He was unemployed at sentencing.

23. Mr. Peterson's case is dissimilar to Carey Walden's.

## CONCLUSION

24**.** Carey Walden is a kind, compassionate, and gentle man.  He suffered a momentary lapse of judgement; not planned, not organized, and devoid of violent intent.  He has lived an honorable life, struggling at times.  He asks that the Court recognize who he really is and allow him to remain employed, uninterrupted.  Perhaps most importantly, he apologizes to this Court and to his country.  He

would turn the clock back if he could but is left with only his honest expression of remorse.

Respectfully submitted,

_____/s/_____

Christopher M. Davis #385582
Davis & Davis
1350 Connecticut Avenue, NW
Suite 202
Washington, DC 20036
202.234.7300

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this sentencing memorandum was served on counsel for the United States via the court's CM/ECF system and by email on this 11th day of January 2022.

_____/s/_____
Christopher M. Davis
