```
 1                  BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,      .
                                    .  Case Number 21-cr-548
 4            Plaintiff,            .
                                    .
 5        vs.                       .
                                    .
 6   CAREY JON WALDEN,              .  January 19, 2022
                                    .  12:06 p.m.
 7            Defendant.            .
     - - - - - - - - - - - - - - - - -
 8

 9                  TRANSCRIPT OF SENTENCING HEARING
                BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                   UNITED STATES DISTRICT JUDGE

11

12   APPEARANCES:

13   For the United States:     JAMES PETERSON, ESQ.
                                United States Department of Justice
14                              1331 F Street Northwest
                                Sixth Floor
15                              Washington, D.C. 20530

16   For the Defendant:         CHRISTOPHER DAVIS, ESQ.
                                Davis & Davis
17                              1350 Connecticut Avenue Northwest
                                Suite 202
18                              Washington, D.C. 20036

19

20   Official Court Reporter:   SARA A. WICK, RPR, CRR
                                United States District Court
21                                 for the District of Columbia
                                333 Constitution Avenue Northwest
22                              Room 4704-B
                                Washington, D.C. 20001
23                              202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.
```

```
1                        P R O C E E D I N G S
2           (All participants present via video conference.)
3               COURTROOM DEPUTY:  Your Honor, we are in Criminal
4     Action 21-548, United States of America versus Carey Walden.
5           If I can have the parties identify themselves for the
6     record, beginning with the United States.
7               MR. PETERSON:  May it please the Court.  Jim Peterson
8     for the government, Your Honor.
9               THE COURT:  Good afternoon, Mr. Peterson.
10              MR. DAVIS:  And Christopher Davis on behalf of
11    Mr. Walden, Your Honor.
12              THE COURT:  Good afternoon, Mr. Davis, Mr. Walden.
13              THE DEFENDANT:  Good afternoon.
14              THE COURT:  And Ms. Baker, thank you for joining.
15              PROBATION OFFICER:  Good afternoon, Your Honor.
16              THE COURT:  We are here for sentencing.  And because
17    Mr. Walden has pled guilty to a petty offense, a misdemeanor,
18    the Court need not make findings under the CARES Act to proceed
19    by way of video conference rather than continue this hearing
20    until Mr. Walden can appear in person.
21          But Mr. Davis, I want to make sure that Mr. Walden
22    understands that he could appear before me.  I'm willing to have
23    him sentenced in person.  I want to make sure that he does want
24    to proceed in this way.  Mr. Davis, is that -- is it because of
25    the pandemic and his desire to resolve this that he's pressing
```

1    this by video conference now?

2            MR. DAVIS:  That is correct, Your Honor.

3            THE COURT:  All right.  Mr. Walden, you understand

4    that I would be happy to have you appear before me in a

5    courtroom for sentencing if you desire?  But we would have to

6    put that off until some time in the future, and I understand

7    from your attorney that you want to resolve this issue -- this

8    case, rather, now.  Is that correct?

9            THE DEFENDANT:  Yes, Your Honor.

10           THE COURT:  Okay.  All right.  I'm willing to proceed

11   by video conference.

12       For the record, I've reviewed the final presentence report

13   and recommendation.  I've also reviewed the parties' sentencing

14   memoranda, the videos provided.  Is there anything else that I'm

15   missing?  Mr. Davis?

16           MR. DAVIS:  There isn't, Your Honor.  That is

17   everything on behalf of Mr. Walden.

18           THE COURT:  Okay.  And Mr. Peterson?

19           MR. PETERSON:  No, Your Honor.  I believe you have

20   everything.  The only thing I would say is that Mr. Davis may

21   have answered that as if he wanted to submit and, I believe, he

22   submitted yesterday just a very short clip, which is subsumed in

23   the clip that the government sent.  That was the only thing that

24   was done yesterday.

25           THE COURT:  Mr. Davis, have you reviewed the

1    presence report with Mr. Walden?

2              MR. DAVIS:  I have, Your Honor.

3              THE COURT:  All right.  And are there any unresolved

4    objections or factual inaccuracies in the PSR?

5              MR. DAVIS:  There is one.  On page 3, there is an

6    alias listed as -- it indicates that he's used the alias of

7    Cherri Bobo, and he indicates to me he never used an alias, and

8    that must be an error somewhere along the lines.

9              THE COURT:  I thought that -- I will hear from

10   Probation if she wants to be heard on this, but I thought that

11   Ms. Baker said that that's what came up in criminal records

12   checks and she's just paraphrasing what those criminal records

13   checks show.

14      Do you dispute that that's what those reports show?

15             MR. DAVIS:  I haven't seen them, but I don't dispute

16   it.  I would just ask that it be eliminated.  We believe it's an

17   error, and there's no sense in repeating it.

18             THE COURT:  All right.  Mr. Peterson, what's the

19   government's position on this?

20             MR. PETERSON:  We do not object if the Court wants to

21   remove it.  I note that his prior conviction and incarceration,

22   I think, are accurately laid out.  And given the nature of those

23   prior convictions, DWI and, I think, a bad check charge, I don't

24   think the alias either makes sense or adds to that analysis.  I

25   do not object.

1          THE COURT:  Okay.  Ms. Baker, if we could have you

2     remove the alias from the presentence report.

3       All right.  So Mr. Walden, I just want to confirm with you

4     that you had adequate time to read the PSR and talk to your

5     attorney about it?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  And you had a chance to correct any errors

8     in the presentence report?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  Are you satisfied with your attorney's

11     services in this case?

12          THE DEFENDANT:  I am; yes, I am.

13          THE COURT:  Have you also had a chance to review all

14     of the other filings that have been made in this case, including

15     the sentencing memoranda and the videos that were provided to

16     the Court?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  All right.  Does the government have any

19     objection to the presentence report?

20          MR. PETERSON:  No.

21          THE COURT:  All right.  I will accept the presentence

22     report as my findings of fact with the one edit that we've

23     discussed already.  I will accept them pursuant to Rule 32 of

24     the Federal Rules of Criminal Procedure.

25       Consistent with Section 1B1.9 of the sentencing guidelines,

1     the guidelines don't apply to this petty offense, which is a

2     class B misdemeanor, though I will consider the factors set

3     forth in Title 18 United States Code Section 3553(a) to decide

4     the appropriate sentence in this case.

5          Mr. Peterson, I will start with you and let you allocute on

6     behalf of the United States.  Before you get started, I did have

7     one question.

8          In footnote 1, you state that a period of probation after a

9     term of incarceration may be appropriate in the defendant's

10    case, and you say that the general prohibition against sentences

11    that combine continuous incarceration and a term of probation

12    don't apply here where the defendant is sentenced for a petty

13    offense.  And you cite an unpublished Fourth Circuit opinion

14    that didn't really analyze this issue.

15         Do you have any other authority to support that

16    interpretation?  I have to say, I'm not so sure that I read

17    those two statutes together in the same way you do to create an

18    exception from the general rule that a Court may not impose both

19    a term of probation and a term of imprisonment.

20         MR. PETERSON:  The only thing I would say in response,

21    and I'm not advocating heavily for it, it's my understanding

22    that that issue has come up in these Capitol riot cases, in

23    several other ones, I believe, and it's none of my cases, and I

24    don't believe in my review of the prior sentencings that Your

25    Honor has been involved in that it's necessarily appeared in

front of Your Honor.  But I do understand that there's some

litigation surrounding it, that it has been advocated in other

cases.

And again, on short notice -- I could follow up if the

Court wanted.  I believe that one other Court in the District of

Columbia in these cases litigating this recently found in

support of that and gave -- I don't know whether it was a split

sentence or a period of probation after a term of incarceration.

I do not have the name of that case at my fingerprints.  I do

know that issue has come up and has been argued in different

cases, I will say a handful of cases, three, maybe five, maybe

more.  I'm aware of only one case, and I do not know that case

name, I can follow up if the Court would like.

THE COURT:  Okay.  Let me just share my thinking on

this, and Mr. Davis, feel free to jump in at any point if you

have anything to add, but as I read Section 3551(b) of Title 18,

it provides that a Court may not impose both a term of probation

and a term of imprisonment.  It states that an individual found

guilty of an offense shall be sentenced in accordance with the

provisions of Section 3553 to, one, a term of probation as

authorized by subchapter (b); two, a fine as authorized by

subchapter (c); or three, a term of imprisonment as authorized

by subchapter (d).

And it seems like the "or" is exclusive because the

subsequent sentence in Section 3551(b) states a sentence to pay

1    a fine may be imposed in addition to any other sentence.  So it

2    seems that that subsequent sentence would be unnecessary if

3    the "or" were inclusive.  That's my first point about that.

4        And I just -- I don't read 3561(a)(3) to create an

5    exception from that general rule.  It seems to me that the

6    phrase "that is not a petty offense" that appears in that

7    provision modifies only the phrase "different offense."  And if

8    that's right, then 3561(a)(3) expands rather than contracts

9    3551(b)'s prohibition on combining probation with incarceration.

10        So I just don't think that -- it seems to me 3561(a)(3)

11    prohibits combining those sentences for a single offense and

12    combining those sentences for two offenses unless one of these

13    offenses -- I just don't think that we can read these sentences

14    in the way that you're suggesting.

15        For that reason, Mr. Patterson, let me just explain that

16    this is one of the main reasons why, in these cases in which a

17    defendant has engaged in what I view as serious conduct, I've

18    been reluctant to impose a short term of imprisonment, as is

19    suggested here by the government, with no period of supervision

20    where a defendant, one, engaged in serious conduct and, two, has

21    risk factors that suggest that potentially recidivism could be a

22    problem down the road, if not in this kind of case in some other

23    kind of case, given this defendant's history, you know, with his

24    alcohol problems and PTSD.  I just am very reluctant to not

25    impose a period -- a substantial period of supervision.

1          MR. PETERSON:  I will start with that, if it may

2     please the Court, and I will just say that -- and just reiterate

3     what I said in my memo.  The government here is requesting that

4     the Court sentence the defendant to at least two weeks of active

5     incarceration, 60 hours of community service, $500 in

6     restitution, and the mandatory $10 special assessment.

7          I will go into the aggravating circumstances from the

8     government's perspective in a minute, but to address the point

9     that Your Honor raised, for this particular case and this

10    particular defendant, we would argue for an active period of

11    incarceration.  I understand what Your Honor just said about the

12    need for supervision, but I would point out, and I believe I'm

13    accurately reviewing his criminal record, to me, to the

14    government what argues most strongly for active incarceration is

15    the prior incarceration and the prior convictions that

16    Mr. Walden had.

17         I believe -- and I can go back and confirm this or

18    Probation can confirm this.  I believe that two of the instances

19    happened in a very short period of time such that that period of

20    probation, whether it be active or inactive probation, was

21    really not effective for him.

22         So I think in this particular defendant's very unique

23    criminal history, it's shown that a period of probation is not

24    necessarily effective.  The government's belief is that in these

25    cases particularly the strongest message that can be sent is

active incarceration.

          THE COURT:  But do you think 14 days or 20 or whatever it is that you're suggesting in prison is going to be an effective deterrent without any continuing substance abuse treatment or mental health treatment or anything?

     Because I don't -- your recommendation imposes imprisonment followed by even community service.  I don't know that that's enforceable if I can't have a period of supervision following his release.  So you're just talking about that short time in prison, and that's going to ensure that he stays on the right track moving ahead, and that's my concern.

     Ms. Baker, can you chime in if you think that I'm reading these two statutes incorrectly, if you think that the Court does have the power to impose a period of incarceration followed by supervision?

          PROBATION OFFICER:  Your Honor, I believe your assessment is correct in terms of a custodial sentence cannot be followed by a term of probation, by supervised release, which of course is not applicable in this case.

     The only other option for the Court is intermittent confinement, which is a condition of probation, which is basically weekend jail.  That's the only way you can do a form of custody in addition to probation, is a condition of intermittent confinement as a special condition of probation.

          THE COURT:  Okay.  Thank you, Ms. Baker.

1      Mr. Davis, I will give you a chance to allocute in a

2  minute, but anything you would like to add with respect to this

3  legal issue that we've been discussing?

4      MR. DAVIS:  Your Honor, as I scan the government's

5  Exhibit Number 1 of the individuals that have been sentenced to

6  date so far, it's consistent with what Your Honor was saying,

7  that no one has received a sentence of probation with a sentence

8  of incarceration.  What I'm seeing is that people are sentenced

9  to probation and then a period of home detention if anything

10 else.

11     THE COURT:  Just to telegraph a little bit where I'm

12 headed, that is, Mr. Peterson, what I'm contemplating here,

13 is -- I do agree with you the conduct is serious and there are

14 risk factors, but it seems to me that what will more effectively

15 deter and potentially rehabilitate Mr. Walden is by taking that

16 approach rather than just a straight limited time in prison

17 followed by no ongoing supervision.  I think he needs it.

18     MR. PETERSON:  I understand that, Your Honor.  Again,

19 I'm not trying to quarrel with the Court.  In my experience as a

20 prosecutor, the strongest message that the Court can send is

21 through incarceration.

22     I would also point out that Mr. Walden is, perhaps, an

23 older offender, and I think that some of the probation that has

24 been issued, I think, historically and perhaps in these cases

25 for younger offenders might not be as applicable to this

1    defendant.

2        And for those reasons, as well as the reasons stated in our

3    sentencing memorandum, the government would argue for active

4    incarceration.  I think without question an active period of

5    incarceration is the strongest message in these cases that the

6    Court can send, whether or not it is followed up with a period

7    of probation.

8        And again, I'm not trying to belabor the point.  I'm

9    certainly not trying to quarrel with Your Honor.  I just want to

10   make it clear the government's position, given the gravity of

11   this situation and given the unique background of this defendant

12   where, if you will, probation has not been effective.  It has

13   not deterred other offenses.  Years have gone by, and those

14   issues have still maintained themselves in terms of needing

15   substance abuse despite prior intervention.  However shallow

16   that was or however minimal that was, it has not been effective.

17   I think the answer is active incarceration.

18        THE COURT:  All right, Mr. Peterson.  And Mr. Davis

19   has tried to distinguish the other cases the government relies

20   upon, the Jancart case, and what was the other one you're

21   pointing to in which Judge Jackson imposed a term of

22   imprisonment?

23        MR. PETERSON:  Your Honor, I apologize for

24   interrupting.  One of the benefits and a huge downside is the

25   fact that we can do multiple things.  And I think the case that

1    maybe had a split sentence was United States versus Virginia

2    Marie Spencer, and that's it.

3         THE COURT:  And can you tell me the case number and

4    who the judge was?

5         MR. PETERSON:  Yes, Your Honor.  Judge -- and I'll

6    butcher the name -- CKK, Kollar-Kotelly, and it's CR-00147, I

7    believe.

8       And again, I'm not trying to quarrel with Your Honor.

9         THE COURT:  I appreciate you pointing that out.

10      Back to the cases, you had analogized this case to the

11   Jancart case and also to the Russell Peterson case.  The defense

12   distinguishes those in its sentencing memorandum.  Do you

13   dispute the ways in which the defense described those cases

14   factually?

15        MR. PETERSON:  No, Your Honor, I don't have any

16   quarrel with anything defense counsel has filed.  I would just

17   point out, I think you can go through any of the cases and find,

18   perhaps, distinguishing characteristics.

19      I would point out in this case, I do think one of the

20   distinguishing cases that I've had a hard time finding other

21   cases, again, it's the prior criminal record, especially the

22   prior criminal record where active incarceration has been

23   imposed.  And I believe in this case, I believe in both Jancart

24   and Peterson -- and they were entries through the Senate wing

25   door, I believe, but no one entered through the window, which I

1    think argues compellingly as an aggravating factor as well.

2        But I don't quarrel with anything defense counsel has filed

3    and said in this.  I do think this case calls for active

4    incarceration, and the government would so request.

5            THE COURT:  Okay.  So with respect to the Jancart

6    case, that defendant went in with a two-way walkie-talkie, a gas

7    mask.  I recognize here the evidence shows that Mr. Walden had a

8    new respirator, but Mr. Jancart made his way to the speaker's

9    conference room, was in the Capitol 40 minutes, carried a

10   backpack that was later found with a pickax in it, and he made

11   some comments regarding a pickax the day of and also deleted

12   some social media posts.

13       You don't quarrel with any of those facts?

14           MR. PETERSON:  No, absolutely not.

15           THE COURT:  And similarly, with respect to the

16   Peterson case, those facts seem quite different to me as well.

17       But Mr. Peterson, I don't mean to derail your allocution.

18   I've read your sentencing memoranda in full.  I know the factors

19   that you're emphasizing.  To me, just to let you know how I'm

20   viewing this case, I think the respirator is certainly

21   aggravating, the scaling of the wall, the entering and exiting

22   through the broken window, the posting "I just climbed the wall,

23   LOL," chanting "traitors, traitors," all aggravating.

24       I think the military service kind of cuts both ways.  It's

25   often viewed by courts as a mitigating factor in determining a

1    defendant's sentence and looking at characteristics and history.

2    But here, I can certainly see why the government also views it

3    as an aggravator.  But I think, as I said, it cuts both ways.

4         You do acknowledge he was only inside for nine minutes; he

5    entered over a half hour after the initial breach; he kind of

6    stayed in the hallway, didn't advance through the Capitol.

7    Correct?

8              MR. PETERSON:  That's absolutely correct.

9              THE COURT:  And he did, and I credit this, promptly

10   accept responsibility and voluntarily agreed to an interview

11   with the FBI and actually turned over voluntarily photos and

12   videos he took that day; right?

13             MR. PETERSON:  That is absolutely correct.  And I will

14   go further than that, and I certainly don't mean to steal

15   Mr. Davis's thunder in any way, shape, or form, but I will say

16   that from the very beginning of this case, Mr. Davis has made it

17   very clear that his client wanted to accept responsibility and

18   enter some type of plea.  And as Your Honor well knows, in these

19   cases the discovery can be so massive overall, not necessarily

20   case specific, and that may be a reason it didn't get before

21   Your Honor before.

22        So I will emphasize further that yes, he was very

23   forthcoming to law enforcement and, after the process got

24   started, through counsel.  Obviously, I can't comment or do not

25   have any knowledge of any interaction with Mr. Walden, and

Mr. Davis perhaps can extrapolate from that if he wants, but through Mr. Davis, he's always been very clear that he wanted a resolution of this that was not a trial. So I bring that to the Court's attention.

Again, I will not repeat, and I do not want to just go over and read verbatim. Your Honor has hit the highlights of what we've said in our sentencing memorandum in terms of what are the aggravating circumstances. I would add to that, Your Honor may not have mentioned, the climbing up the wall, I do think that that's something that changes it a bit.

I'm trying to be laser-like focused because I know Your Honor has sentenced at least three defendants, perhaps more, and many more than that you're aware of the factual backgrounds of the circumstances of each case. So in this case, I am trying to have a laser focus.

One of the compelling facts that jumps out to me, again not to belabor it -- and I realize his prior incarceration was minimal. But the fact of a prior incarceration, the fact that there's prior offenses to me screams out for what I will say is a more serious sentence than what he has previously gotten for concededly much less serious offenses.

And the last thing I would say to perhaps distinguish or to add to the Jancart and the Russell Peterson case, we are asking for a significantly shorter period of incarceration than was actually given in those cases. That may account in Your Honor's

1    mind for a less intrusive entry into the Capitol.  I know one

2    did go to the speaker's conference room.

3        Here, it was not a very intrusive entry.  Mr. Walden did

4    stay in the area immediately by the Senate wing door, although

5    he gained entry through that.

6        And beyond that, Your Honor, the government's

7    recommendation is primarily for active incarceration.  I will

8    answer whatever questions Your Honor has and then respond to

9    counsel if the Court has any follow-up.

10            THE COURT:  Okay.  I appreciate that part of the

11   driver here for the government's recommendation is the prior

12   record.  And just to be clear, he has two prior DUIs, one of

13   which he violated while on probation; right?

14            MR. PETERSON:  Right.

15            THE COURT:  Okay.  And the violation on probation was

16   the second DUI?

17            MR. PETERSON:  I believe that's correct.

18            THE COURT:  All right.  So clearly, he has a problem

19   with alcohol, if not other substance abuse.  So again, that is a

20   concern that I think needs to be focused on, and I don't know to

21   what extent that was before.  But that's a concern.

22        With regard to the backpack, he said that it contained his

23   belongings.  The government doesn't have any evidence he was

24   armed or violent or organized this event in any way or destroyed

25   any property; correct?

1          MR. PETERSON:  None, Your Honor.

2          THE COURT:  And nothing about the backpack?

3          MR. PETERSON:  Nothing.

4          THE COURT:  Okay.  All right.  Mr. Davis?

5          MR. DAVIS:  Thank you.  Your Honor, with respect to

6    the prior conviction, and I think I addressed this in my memo,

7    first of all, they're 14 years old.  I don't think -- I do not

8    believe Mr. Walden has a problem with alcohol.  He was monitored

9    by Pretrial Services during the pendency of this case, and he

10   has presented no problems whatsoever.  His conduct here wasn't

11   related to alcohol either.

12        And the two offenses that he picked up back in 2006 and

13   2007, they were close in time to one another, but I would note

14   it's after he left the military after having served for in

15   excess of a decade, and when he returned home, he found his wife

16   at that time had hooked up with his brother-in-law, and he was

17   going through a lot of problems.

18        It was also during that time period -- well, I don't think

19   he was diagnosed right then, but shortly thereafter, he was

20   diagnosed with post-traumatic stress syndrome, and he has been

21   receiving disability checks since then.

22          THE COURT:  And to what extent, Mr. Davis, is he

23   receiving any mental health treatment for PTSD, which sounds

24   severe?

25          MR. DAVIS:  He is not receiving -- I mean, it's

available to him at the VA, and I think I would let Mr. Walden
speak more to what's going on with that.  He was medicated at
one time, but the side effects were more adverse than the
post-traumatic stress syndrome.

But in any event, just to put into perspective these two
DWIs that came back to back, I think readjusting to civilian
life, finding what he left when he was in the military had been
destroyed and then his experiences in the military, I think all
of those contributed to his DWIs.

The bounced check, I mean, it's -- a lot of states don't
even do this, but apparently, Missouri is one that does.  It's
almost like a debt collection agency.  People use the courts as
a debt collection agency.  I would submit that it's really not
indicative of criminal behavior.  It's just indicative of the
chaotic times he was experiencing back during 2006 through 2008.

I would note that -- Your Honor pointed out that he had a
respirator.  It was a paint mask.  Through his military
training, and to this extent it really did influence some of his
conduct here, he was exposed to pepper spray when he was in the
Marines, and he knows the symptoms of it.

And actually, the ten-second clip I provided the Court, you
can see the elderly man, he's somewhat overweight, the first
thing he asks is, what can I do, and Mr. Walden is demonstrating
what he can do.  He's moving his hands.  He's bobbing his head
up and down.  What he is explaining to this man who had been

pepper sprayed is the best thing he can do is wash his eyes out with water but make sure he has his head down so that the pepper spray contaminants don't get in other pores on his face.

It's kind of ironic that the one thing that makes him look the worst is the one thing that probably helped him when he was there.  He brought it --

THE COURT:  But why travel to D.C. with that?  That just screams out that he's looking for trouble.

MR. DAVIS:  Well, let me tell you where this came from, and I've heard this from other Capitol riot defendants.  There was all this information being promulgated over social media and the Internet.  He came here -- first of all, it wasn't even a plan.  He came here because his friend couldn't come, and he had a ticket for a busload of people who had formed a group -- actually, I think there were two or three buses that had formed a group to come to Washington and see the president speak.

Through that media group, which was only a few days, they were putting all these posts on about how elderly Trump supporters had run into problems on the streets of the District of Columbia, and they were advising people to do things like this, to bring a mask in case you're sprayed with pepper spray and things of that nature.  And that is why he did that.

And ironically, he didn't even -- I think I pointed this out in the memo.  He didn't even see the president speak because

1    he ended up staying at Union Station with a number of other

2    people, and he was kind of assisting them in various ways.

3          THE COURT:  Were these people who also went to the

4    Capitol?

5          MR. DAVIS:  I don't know.  I never asked him if any of

6    these people went.  He did indicate many of them were elderly,

7    but then again, there were elderly people that went.

8          He did go through a broken window.  He did climb a wall.

9    But I think that "laugh out loud" post is the only post that he

10    made on social media.  He was very honest with everyone.  Unlike

11    Jancart or Peterson, he didn't post social media posts

12    advocating for revolution or for overthrowing the government or

13    doing anything nefarious.  He posts, "LOL, I climbed the wall."

14          Actually, I was kind of shocked when I heard that because

15    Mr. Walden, one, he's getting up there in age, and he's a big

16    guy.  I'm surprised he could make it up the wall.

17          The one disturbing thing, and I've talked to Mr. Walden

18    about it, is the chant.  He got into the Capitol, and shortly

19    after that, he went over and he started assisting this fellow

20    that had been pepper sprayed.  And he did participate in the

21    chant for a few seconds, "traitor, traitor."

22          He left right after that because it was at that point he

23    recognized what was really going on, and he was going to get out

24    of there.

25          He has a new job now.  He's been in it a little over a

1    month.  Up until a couple of months ago, he was in a commercial

2    divers training school to do welding and things of that nature,

3    but he did not pass the physical.  He's prediabetic, and he had

4    to leave.  So he got back to Missouri, and he promptly obtained

5    a job, and within a month, he's been promoted to a supervisory

6    role, which he now occupies.

7        He is the sole source of income for his household.  He's

8    with his wife.  They have an apartment.  It's a modest

9    apartment.  His wife doesn't work.  She's been diagnosed and has

10   been out of work as a result of having rheumatoid arthritis.

11       What I would ask Your Honor to do is, whatever sentence you

12   impose, to take into consideration that by and large this is a

13   blip in an otherwise admirable life.  This fellow really hasn't

14   engaged in criminal conduct.  I think the DWIs, though unlawful,

15   I think there's a background story to it that puts things into

16   perspective.  And though the military can be viewed both ways, I

17   think in Mr. Walden's case, I think it can be viewed favorably

18   to him as far as he's concerned.

19       He is not a violent person.  He is not an unlawful person.

20   And I can tell the Court, and Your Honor can certainly inquire

21   of him, that if he could change what happened that day, he

22   wouldn't have even gone to Washington.  We've had this

23   conversation on a number of occasions.

24           THE COURT:  All right.  Thank you, Mr. Davis.

25       Mr. Walden, you have the right to make a statement if you

1    would like to do so.  Is there anything you would like to say

2    before I impose sentence?

3              THE DEFENDANT:  Yes, ma'am.

4        Your Honor, as Mr. Davis said, if I could take it all back,

5    I would.  I didn't know -- I didn't see a lot of what I saw on

6    TV when I was there.  It was a terrible day, and I'm really

7    ashamed of myself that I was a part of that.

8        I really don't know what else to say other than I wish I

9    hadn't been there, and I'm sorry that I did that.

10             THE COURT:  All right.  Thank you, sir.  I appreciate

11   your comments.

12             THE DEFENDANT:  Thank you.

13             THE COURT:  Is there any reason why sentence should

14   not be imposed at this time?  Mr. Davis?

15             MR. DAVIS:  No, Your Honor.

16             THE COURT:  Mr. Peterson?

17             MR. PETERSON:  No, Your Honor.

18             THE COURT:  All right.  As I've already noted, I'm

19   required to consider the various factors outlined in Title 18

20   United States Code Section 3553(a).  I'm familiar with all the

21   factors, and I've considered them each here, even if I don't

22   mention each one.

23       Although the charge to which Mr. Walden pled guilty is a

24   petty offense, a misdemeanor, his criminal conduct was very

25   serious.  He was a willing participant in a riot or an

insurrection that undermined our democratic electoral process and values.

Mr. Walden did not injure any officers or anyone else or damage any property on that date of January 6, 2021.  There's also no evidence that he carried any weapons that day or that he engaged in any preplanning with others.  But his presence and his active participation in the attack on the Capitol subjected law enforcement officers who put their lives on the line every day to protect the Capitol and those who work there to greater risk.

Mr. Walden has since demonstrated acceptance of responsibility when he's acknowledged well before today's sentencing hearing that what he did was wrong.  And as he said here today, he's ashamed of his actions on that day.  He recognized shortly after these events that his conduct was wrong, and he willingly submitted to a voluntary interview with law enforcement and fully cooperated, providing law enforcement with photographs and videos he took that day.  And this all happened before his arrest.  He's been very clear and unequivocal about that from the time he was interviewed that what he did was wrong.  And this is a very important factor in my mind, particularly in terms of his likelihood of recidivism in doing at least something like this again.

And I do agree that Mr. Walden's extensive military service all over the world is commendable.  Even so, I'm not viewing it

either as a mitigating factor, as the defense argues, or as an aggravating factor, as the government argues. It's admirable that Mr. Walden served the country, but it does make it all the more confounding that he would engage in this kind of conduct on January 6.

Mr. Walden is gainfully employed and has been consistently employed. He does have a prior record, primarily alcohol related, and although both offenses are dated, it does give the Court some concern about potential for substance abuse, particularly with his struggles with PTSD. And for those reasons, as I've stated, I am inclined to order mental health and substance abuse treatment as determined by probation.

Looking at the range of sentences, this petty offense has a maximum penalty of six months' imprisonment, up to five years' probation, and a maximum fine of $5,000. It's also subject to a $10 special assessment. Consistent with what Probation has found, I do not find that Mr. Walden has the ability to pay a fine in this case, but consistent with the plea agreement, I will impose restitution in the amount of $500 to defray some of the costs associated with the January 6 damage to the Capitol.

I have considered the cases that the government cited in its memorandum and also in its exhibit, its chart. I've not reviewed all the cases, but I have looked at those that the parties have highlighted. As I've explained, I think Mr. Walden's conduct is less aggravated than that of Mr. Jancart

and Mr. Peterson.  I also am viewing his case as less egregious than Ms. Dillon's.  She's a defendant I sentenced to three years' probation and two months' home detention.  Ms. Dillon came prepared to attack the Capitol and physically engage with law enforcement on the front lines as the violent mob breached the Capitol.

I'm also viewing Mr. Walden's conduct similar to Mr. Kostolsky, who I sentenced last week to three years' probation with 30 days' home detention.  I also view this case as somewhat similar to the case involving Mr. Jordan Stotts, who Judge Kelly sentenced to 24 months' probation, two months' home detention, and 60 hours of community service.  Stotts and Kostolsky, like Mr. Walden, climbed the outer wall of the Capitol, but Stotts stayed inside the Capitol a longer period of time and resisted law enforcement officers to clear out rioters in the rotunda.

So consistent with the sentences imposed in similar cases, I do find that a sentence of three years' probation coupled with a period of 30 days' home detention and community service with mental health and substance abuse treatment as needed and a $500 restitution payment is sufficient but not greater than necessary to address the goals of sentencing.

I believe this sentence will protect the community and fulfill the goals of deterrence, both specific and general, as well as impose a proper amount of punishment and respect for the

law.  I do not believe a sentence of imprisonment is necessary to do that.

So I will give both sides a chance to object before actually imposing sentence, but I will now read the formal sentence of the Court.

Pursuant to the Sentencing Reform Act of 1984 and in consideration of the provisions of Title 18 United States Code Section 3553, it is the judgment of the Court that you, Carey Jon Walden, are hereby sentenced to a term of three years' probation on Count -- is this Count 1, Mr. Peterson?

MR. PETERSON:  Yes.  It's an information.

THE COURT:  Okay.  Count 1 of the information.  In addition, you are ordered to pay the special assessment of $10. As I've said, I find you don't have the ability to pay a fine. Therefore, I waive imposition of a fine in this case.

While on supervision, you shall abide by the mandatory conditions, which include not committing another federal, state, or local crime, not unlawfully possessing a controlled substance, refraining from any unlawful use of a controlled substance, submitting to one drug test within 15 days of placement on supervision and at least two periodic drug tests thereafter as determined by Probation, also making restitution.

I do authorize the supervision and jurisdiction of this case will be transferred to the United States District Court for the Western District of Missouri.

1    I will impose the following special conditions:  You must

2    complete 60 hours of community service within 20 months.  The

3    probation officer will supervise your participation in the

4    program and approve.  You will need to file a written

5    verification of your completed hours.

6    You will also be monitored by a form of location monitoring

7    technology that is determined at the discretion of the probation

8    officer, which could include RF monitoring, GPS monitoring, or

9    voice recognition.

10    You will be restricted during that period of 30 days to

11    your residence at all times except for employment, education,

12    religious services, medical or substance abuse or mental health

13    treatment, attorney visits, substance abuse treatment, court

14    appearances, court ordered obligations, or other activities that

15    are pre-approved by the officer.

16    You must submit to substance abuse testing and treatment as

17    determined by Probation, as well as mental health treatment as

18    determined by Probation.

19    The restitution is to the Architect of the Capitol in the

20    amount of $500.  The financial obligations are immediately

21    payable to the Clerk of Court.  You shall notify the Clerk of

22    Court of any change of address.

23    The Probation Office shall release the presentence report

24    to all appropriate agencies.

25    Does either side have any objections to the sentence as

1  I've just stated it?

2          MR. PETERSON:  No, Your Honor.  Thank you.

3          MR. DAVIS:  Not on behalf of Mr. Walden.

4          THE COURT:  And how about Probation?  Any additions or

5  corrections to make to the sentence, Ms. Baker?

6          PROBATION OFFICER:  No, Your Honor.

7          THE COURT:  All right.  So that is the sentence

8  imposed.

9      And Mr. Walden, you do have the right to appeal your

10  conviction and sentence except to whatever extent you have

11  validly waived that right as a part of your plea agreement.  If

12  you do choose to appeal, your notice of appeal must be filed

13  within 14 days of judgment of conviction.

14      Are there any remaining counts that need to be dismissed,

15  Mr. Peterson?

16          MR. PETERSON:  Yes, Your Honor.  The government would

17  move to dismiss the remaining counts from the complaint.

18          THE COURT:  Okay.  That motion is granted.

19          MR. PETERSON:  Thank you.

20          THE COURT:  Anything else, Mr. Peterson?

21          MR. PETERSON:  No, Your Honor.  Thank you, Your Honor.

22          THE COURT:  Mr. Davis?

23          MR. DAVIS:  More directed to the Probation Office,

24  Your Honor, the procedure Mr. Walden should follow in terms of

25  connecting with the Probation Office so that home monitoring can

```
 1    be set up, should I just have him call Probation or contact

 2    Pretrial Services and ask them who he should contact, or will

 3    Ms. Baker be able to provide us with a contact number?

 4              THE COURT:  I think Ms. Baker can do that.  Is that

 5    right, Ms. Baker?

 6              PROBATION OFFICER:  Yes.  Mr. Davis, immediately at

 7    the conclusion of the hearing, I will go over the probation

 8    rules as well as give him the contact information for the

 9    Western District Probation Office in Missouri.

10              MR. DAVIS:  Okay.  So I will just send you a link, and

11    we can do that right after this, then.

12              PROBATION OFFICER:  Yes.

13              MR. DAVIS:  Okay.  Great.

14              THE COURT:  All right.  Mr. Walden, I wish you all the

15    best.

16              THE DEFENDANT:  Thank you, Your Honor.

17              COURTROOM DEPUTY:  Your Honor, please forgive me.  Did

18    you address the special assessment, or maybe you did and I just

19    missed it?

20              THE COURT:  I thought I did, but if not, there's a $10

21    special assessment.

22              MR. PETERSON:  I heard the special assessment.

23              THE COURT:  Okay.  Thank you all.

24        (Proceedings adjourned at 12:50 p.m.)

25
```

1    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Sara A. Wick, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7        Please Note:  This hearing occurred during the

8    COVID-19 pandemic and is, therefore, subject to the

9    technological limitations of court reporting remotely.

10

11

12   /s/ Sara A. Wick                    January 21, 2022

13   SIGNATURE OF COURT REPORTER         DATE

14

15

16

17

18

19

20

21

22

23

24

25